Kolin C. Tang
Shepherd Finkelman Miller
 & Shah, LLP
11755 Wilshire Blvd, 15th Floor
Los Angeles, CA 90025
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

*Attorneys for Plaintiff and the Plan*

[Additional Counsel Listed On Signature Page]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE H. SOLANO,<br>Individually and On Behalf of the<br>WALMART 401(K) PLAN f/ka<br>WAL-MART PROFIT SHARING<br>AND 401(K) PLAN,<br><br>Plaintiff,<br><br>v.<br><br>WAL-MART STORES, INC.,<br>RETIREMENT PLANS COMMITTEE<br>FOR THE WALMART 401(K) PLAN,<br>JAMES I. CASH, JR., C. DOUGLAS<br>MCMILLON, GREGORY B. PENNER,<br>S. ROBSON WALTON, SALLY<br>WELBORN, RUSSELL INVESTMENTS<br>MANAGEMENT CO., and DOES NO. 1-10,<br>Whose Names Are Currently Unknown,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

## I. INTRODUCTION

1.     Plaintiff, Jose H. Solano ("Plaintiff"), individually and on behalf of the Walmart

401(k) Plan f/k/a Wal-Mart Profit Sharing and 401(k) Plan (the "WalMart Plan" or the "Plan"),

brings this action under 29 U.S.C. § 1132 on behalf of the Plan against Defendants, Wal-Mart

Stores, Inc. ("Wal-Mart" or "WalMart" or "Company"), the Retirement Plans Committee for the

WalMart Profit Sharing and 401(k) Plan ("Retirement Plans Committee"), James I. Cash, Jr., C.

Douglas McMillon, Gregory B. Penner, S. Robson Walton, Sally Welborn, Russell Investments

Management Co. ("Russell") and Does No. 1-10, who are or were members of the Retirement

1   Plans Committee during the pertinent period and whose names are currently unknown

2   (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee

3   Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

4          2.     Defined contribution plans that are qualified as tax-deferred vehicles under

5   Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.,* 401(k) plans), have

6   become the primary form of retirement savings in the United States and, as a result, America's *de*

7   *facto* retirement system.  Unlike traditional defined benefit ("DB") retirement plans, in which the

8   employer typically promises a calculable benefit and assumes the risk with respect to high fees or

9   under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a

10   manner in which participants bear the risk of high fees and investment under-performance.

11          3.     The importance of defined contribution plans to the United States retirement

12   system has become pronounced as employer-provided DB plans have become increasingly rare

13   as an offered and meaningful employee benefit.

14          4.     With more than $20 billion in assets, the Plan is in the top one-tenth of one

15   percent (0.1%) of 401(k) plans in terms of assets.  The marketplace for 401(k) retirement plan

16   services is well established and can be competitive when fiduciaries of defined contribution

17   retirement plans act in an informed and prudent fashion.  Multi-billion dollar defined

18   contribution plans, like the Plan, have significant bargaining power and the ability to demand

19   low-cost administrative and investment management services within the marketplace for

20   administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan,

21   Defendants are obligated to act for the exclusive benefit of participants, invest the assets of the

22   Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent

23   times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their

24   fiduciary duties under ERISA by failing to fully disclose to participants the expenses and risks of

25   the Plan's investment options; (c) breached their fiduciary duties under ERISA by allowing

26   unreasonable expenses to be charged to participants for administration of the Plan; and (d)

27

28                                       -2-

breached their fiduciary duties under ERISA by selecting and retaining opaque, high-cost, and poor-performing investments instead of other available and more prudent alternative investments.

5. To remedy these fiduciary breaches and other violations of ERISA, Plaintiff, individually and on behalf of the Plan, brings this action under Section 502, 29 U.S.C. §1132, and Section 409 of ERISA, 29 U.S.C. §1109, to recover and obtain all losses resulting from each breach of fiduciary duty. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate and just under all of the circumstances.

6. Plaintiff specifically brings this action on behalf of the Plan under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

7. Plaintiff was a participant under 29 U.S.C. §1002(7) of the WalMart Plan, which is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34). Plaintiff is a resident of Simi Valley, Ventura County, California. The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102, and serves as a vehicle for retirement savings and to produce retirement income for employees of WalMart. Retirement income generated by the Plan depends upon contributions made on behalf of each employee by WalMart, deferrals of employee compensation and

employer matching contributions, and from the performance of the Plan's investment options (net of fees and expenses). WalMart established a trust (the "Trust" or "Trust Fund") to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the Trust, in accordance with 29 U.S.C. § 1103. As of December 31, 2015, the Plan was one of the country's largest 401(k) plans, with more than $20 billion in assets and 1.7 million participants, and the Plan currently has over $20 billion in assets.

8.     Defendant, WalMart, is a corporation organized and existing under the laws of Delaware, with its principal place of business in Bentonville, Benton County, Arkansas. WalMart is the Plan's sponsor, Administrator, a designated fiduciary of the Plan, and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102.

9.     Defendant, Retirement Plans Committee, is a named fiduciary under the Plan, administers the Plan, and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102. The Retirement Plans Committee maintains its address at WalMart's headquarters in Bentonville, Benton County, Arkansas. The Retirement Plans Committee consists of three (3) to ten (10) members, who, upon information and belief, are appointed by Defendant, Sally Welborn, who serves as a member of the Retirement Plans Committee and has been designated by WalMart as the "Appointing Fiduciary" of the Plan with the power, duty and responsibility to appoint members of the Retirement Plans Committee.

10.     Defendant, Sally Welborn ("Welborn"), is WalMart's Senior Vice President for Global Benefits, is a member of the Retirement Plans Committee and, upon information and belief, is the designated "Appointing Fiduciary" of the Plan and a resident of Bentonville, Benton County, Arkansas.

11.     Defendant, Russell, serves as a fiduciary investment adviser to the Plan and maintains its headquarters and principal place of business in Seattle, King County, Washington.

12.     Defendants, Does 1-10, are the members of the Retirement Plans Committee and,

by virtue of their membership, are fiduciaries of the Plan.  Plaintiff is currently unable to determine the membership of the Retirement Plans Committee despite reasonable and diligent efforts because it appears that the current membership of the Retirement Plans Committee is not provided to the public.  As such, these unknown defendants are named Does 1-10 as placeholders.  Plaintiff will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Retirement Plans Committee as defendants as soon as their identities are discovered.

13.     Welborn and Does 1-10 are referred to herein collectively as the "Committee" or the "Retirement Plans Committee" or the "Retirement Committee" or the "Committee Defendants" or the "Retirement Committee Defendants."  All Retirement Committee Defendants are fiduciaries under ERISA by virtue of their service on the Committee.

14.     Defendant, James I. Cash, Jr. ("Cash"), is a member of the Executive Committee of the Board of Directors of WalMart ("Executive Committee"), which is responsible for supervising the work of the Retirement Plans Committee, and, upon information and belief, is a resident of Sarasota, Sarasota County, Florida.

15.     Defendant, C. Douglas McMillon ("McMillon"), is the President and Chief Executive Officer of WalMart, and is a member of the Executive Committee.  Upon information and belief, McMillon is a resident of Bentonville, Benton County, Arkansas.

16.     Defendant, Gregory B. Penner ("Penner"), is the Chairman of the Board of Directors of WalMart, is a Partner of Madrone Capital Partners and is a member of the Executive Committee.  Upon information and belief, Penner is a resident of Atherton, San Mateo County, California.

17.     Defendant, S. Robson Walton ("Walton"), is the retired Chairman of the Board of Directors of WalMart, and is a member of the Executive Committee.  Upon information and belief, Walton is a resident of Bentonville, Benton County, Arkansas.

18.     Defendants, Cash, McMillon, Penner and Walton, are referred to herein

-5-

1   collectively as the "Executive Committee" or the "Executive Committee Defendants."  All

2   Executive Committee Defendants are fiduciaries under ERISA by virtue of their service on the

3   Executive Committee and their responsibility to supervise the Retirement Plans Committee.

4         19.    WalMart, the Retirement Plans Committee, the Executive Committee and Russell

5   are referred to herein collectively as "Defendants."

6   ### III.    JURISDICTION AND VENUE

7         20.    Plaintiff seeks relief on behalf of the WalMart Plan pursuant to ERISA's civil

8   enforcement remedies with respect to fiduciaries and other interested parties and, specifically,

9   under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

10        21.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and

11  ERISA Section 502(e), 29 U.S.C. § 1132(e).

12        22.    Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29

13  U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Plaintiff resides in this judicial district.

14  ### IV.    FACTUAL ALLEGATIONS

15  **A.**    **Background**

16      **1.**    **The WalMart Plan Management Structure**

17        23.    The WalMart Plan is a participant-directed plan in which participants direct their

18  retirement assets into a pre-selected menu of investment offerings consisting of mutual funds,

19  WalMart common stock, common collective trusts, and a money-market fund.

20        24.    Pursuant to the WalMart Plan, which was established for the "exclusive benefit"

21  of WalMart's eligible employees, WalMart, as the named and designated plan administrator and

22  fiduciary, appointed the Retirement Plans Committee to administer the Plan on its behalf.  The

23  Retirement Plans Committee is thus delegated with WalMart's full discretionary authority to

24  administer the Plan in accordance with the Plan documents and ERISA, as well as, among other

25  things, the full discretionary responsibility, power and authority to (a) manage, interpret and

26  administer the Plan, (b) allocate Plan expenses, including determining the amount and manner in

27

28                                        -6-

which participants will bear Plan expenses and whether to "levelize" Plan expenses across participants, (c) determine participant eligibility in the Plan, (d) establish procedures for allocation of responsibilities between the fiduciaries of the Plan, (e) establish a written investment policy statement, (f) determine the amount of benefits payable under the Plan, and (g) retain the services of a fiduciary investment adviser.

25.     At all pertinent times, the Committee Defendants had the sole discretion to determine the investment options available to participants in the Plan and the investment policy and philosophy to be pursued by the Plan.  In addition, the Committee had the discretion to direct the investment of any non-participant directed assets held within the Trust on behalf of the Plan.

26.     Russell, as the fiduciary investment adviser to the Plan, provided investment advice for a fee to the Plan in connection with the investment policy adopted by the Plan and the investments made available to the Plan participants within the Trust on behalf of the Plan.  By failing to ensure that the Plan participants were offered appropriate and well-diversified investment options, Russell breached its fiduciary duties to the Plan.

27.     The Plan can only be amended by the Retirement Plans Committee with the consent of the Executive Committee. The Executive Committee is responsible for supervising the Retirement Plans Committee and, at all pertinent times, breached its fiduciary duties by failing to properly supervise the Retirement Plans Committee to avoid the breaches of duty committed by the Retirement Committee.

28.     The WalMart Plan's assets are held under the Trust.  All investments and asset allocation are performed through the Trust Fund by its Trustee, the Northern Trust Company ("Northern" or "Northern Trust").

**2.     The Plan's Investment Offerings**

29.     The WalMart 401(k) Plan offers nine (9) core investment options [consisting of a bond fund, international equity fund, small-mid cap equity fund, large cap equity fund, real assets fund, and ten (10) target date funds, all of which are collective trusts (combining internally a

-7-

myriad of investments layered within these collective trusts), utilizing approximately a combined 35 underlying investment managers. The target date funds (which are created and named by the Committee as "myRetirement Fund[s]") also are the default investment alternative for any Plan participant that fails to make an investment choice for his or her Plan accounts.

30.     In addition to the myRetirement Fund target date funds, the Plan currently offers the following core investment options:

| Asset Class | Investment Option |
| --- | --- |
| International | International Equity Fund |
| US Large Cap Core | BlackRock Russell 1000 Index Trust |
| US Large Cap Equity | Large Cap Equity Fund |
| Small-Mid Cap Equity | Small Mid Cap Equity Fund |
| Real Asset | Real Assets Funds |
| Broad Market Fixed Income | Bond Fund |
| Short-Term Fixed Income | JPMorgan Short Term Bond Trust |
| Money Market | BlackRock Money Market Trust |
| Employer Stock | WalMart Common Stock |

31.     The structures of most of the investment options offered within the Plan, including the nine (9) core investment options and ten (10) target date funds, are highly complex, involving multiple advisers and sub-advisers, as well as advisory and administrative charges.

32.     For example, each core investment option (other than the two BlackRock index funds, the BlackRock money market and the JP Morgan Short Term Bond Trust) includes an average of seven (7) underlying managers and each target date fund may average thirty-five (35) underlying managers. All of the investment options are collective trusts and most (as funds of funds), in turn, invest in underlying collective trusts. None of the investment options provide prospectuses or similar disclosures -- despite the requirements of the Plan's Investment Policy Statement that such disclosures be provided.

33.     The true expense ratios associated with the core investment options (with the

-8-

exception of the two BlackRock index funds, the BlackRock money market and the JP Morgan Short Term Bond Trust), are not disclosed to participants because all of the layers of fees paid to the multiple advisers involved in each investment are effectively concealed.  That is because the actual fees associated with these investments are masked and are only indirectly reflected in the performance of these investment options (without participants being provided with the opportunity to understand and evaluate that they are paying enormous fees for overall, poor net performance).   In addition, there is limited and incomplete disclosure to Plan participants as to the identity of the multiple advisers, and no disclosure as to how much each adviser is paid with respect to each investment option.

34.    With respect to the core investment options (with the exception of the two BlackRock Index Funds, the BlackRock Money Market Fund and the JP Morgan Short Term Bond Trust), the underlying managers of the funds, manager allocations and how much each manager is paid, are not disclosed to participants.

35.    While the target date funds disclose gross expense ratios, targeted allocations for each asset class and the managers of some of the assets within each asset class, the complete list of managers and how much each is paid are not disclosed.  Given the multiple managers involved and the lack of transparency, the risk of undisclosed fees is significant. Further, the complexity of these investments is easily avoidable and unnecessary, and results in inadequate information being offered to participants to permit them to make truly informed decisions regarding these investment options.

36.    The annual fee disclosure provided to participants likewise states that the expense "ratios change from time to time based upon changes in managers, changes in managers [*sic*] fees, and changes in asset allocations."  But no performance track records are provided to participants for the underlying collective funds in which the core and target date funds are invested, while limited and incomplete performance information is provided for the core and target date funds themselves.

37.     With the notable exceptions of the two BlackRock Index Funds, the BlackRock Money Market and the JP Morgan Short Term Bond Trust, the information provided to participants is plainly insufficient to enable them to choose among the investment alternatives available.  Since the names of the managers, the fee each is paid, and the investment performance track records of the collective trusts and underlying collective trusts have not been provided to participants, participants cannot make informed investment decisions regarding the assets in their accounts. Thus, the requirements of ERISA Section 404 (c) have not been met by the Plan.

38.     It also appears that the core options are managed largely by the same 35 managers as the target date funds -- a fact which is not disclosed to participants.  In essence, only those participants that choose to invest in the two BlackRock Index Funds, the BlackRock Money Market and the JP Morgan Short Term Bond Trust, are informed about who is managing their money, how well the manager is performing and how much the manager is paid.

39.     According to the Plan's Investment Policy Statement, "investment alternatives may consist of pooled funds, collective trusts or mutual funds whose eligible investments, investment guidelines, and investment philosophies are governed by a prospectus or similar disclosure."  Neither the core options nor the target date options are governed by a prospectus or provide similar disclosure.  Indeed, scant (and plainly deficient) information is provided to participants regarding any investment option besides the BlackRock Index Funds, the BlackRock Money Market and the JP Morgan Short Term Bond Trust.

40.     According to the Plan's Investment Policy Statement, the Committee may select investment alternatives and managers at any time at its discretion.  In addition, the Committee may use the services of one or more outside investment advisers to assist in the selection of alternatives and managers.  No outside adviser is named or disclosed to participants and, therefore, participants do not know if one exists.  Based upon the Plan's Form 5500, it appears, however, that Russell (which is labeled as a consultant) is serving as the fiduciary investment adviser to the Plan.

-10-

41.     There are nine (9) core investment options available under the Plan that participants may choose from, including an International Equity, US Large Cap Core, US Large Cap Equity, US Small Cap Core, Small-Mid Cap Equity, Real Assets, Broad Market Fixed Income, Short-Term Fixed Income and Money Market, as detailed above.  Only two (2) of these options are passively managed -- that is the BlackRock Index Funds charging fees of 2 bps (0.02%) (large cap core index) and 4 bps (0.04%) (small cap core index).  While a prior settlement agreement (discussed more fully below) provided that Defendants would consider adding additional low-cost index funds as Plan options, the Committee failed to do so.  Indeed, rather than adding additional index funds, the Committee recently and inexplicably added actively managed large cap and small-mid cap funds to compete with the only index funds offered, along with the complex and opaque investments described above.

42.     As noted above, all of the core investment options are collective trusts -- not publicly-traded registered mutual funds.  Mutual funds offer greater regulatory protections and transparency.  Five of the nine core options (International Equity, US Large Cap Equity, Small-Mid Cap Equity, Real Assets, and Broad Market Fixed Income) appear to be custom collective funds, each utilizing, on average, seven managers selected by the Committee.  These same custom collective trusts are included in the target date fund asset allocations.  BlackRock is the sole manager for the two Index Funds and the Money Market fund.  JP Morgan is the sole manager of the Short-Term Bond fund.

43.     Although the core options are generally below average in costs for mutual funds offered by plans with assets greater than $1 billion, the fees associated with these investment options is grossly excessive for a Plan with over $20 billion in assets, especially for collective trusts that generally are supposed to be less expensive than mutual funds.

44.     Collective trusts generally offer lower costs than even institutional share mutual funds.  However, actively managed collective trusts are generally costlier than passively managed mutual funds.  Two of the actively managed funds (large cap equity and small-mid cap equity)

were newly added in 2015 and have no stated performance within the Plan. These newly-added funds are inexplicably offered as alternatives to the two index funds offered, even though research and statistics establish that actively managed funds have virtually no prospect of out-performing passively managed funds, net of fees and expenses.

45.     The performance of each option offered by the Plan since inception, while disclosed, is not compared against any benchmark.  This is also true of the target date funds. Thus, it is virtually impossible for Plan participants to evaluate the long-term performance of the core and target date options against any relevant benchmark.

46.     The especially costly Real Assets Fund, which supposedly charges 55 bps (0.55%) and was added as an investment option in the Plan in 2013 (putting aside additional layered fees), massively underperformed (-9.78%) its benchmark (-1.66 percent) on a one-year basis.   Given the low average account balances (approximately $15,000) in the Plan, it is difficult to understand how the Committee could conclude that adding this speculative, costly investment option was prudent.

47.     As noted above, the expense ratios for the Core Funds do not appear to include all applicable layers of fees. The fees, as disclosed, appear reasonable for actively managed core funds in the over $1 billion plan market but, as noted above, they are plainly excessive for a plan with more than $20 billion in assets (especially when the fact that the investments are collective trusts is taken into account).  Moreover, the fees are exponentially greater than passively managed funds.

48.     Amazingly, the Plan does not currently offer its participants a "stable value" investment option or a self-directed brokerage window making a stable value option available, even though the vast majority of defined contribution retirement plans in the United States offer a stable value investment option to their participants.  A stable value fund is an investment vehicle typically found in company retirement plans that guarantees a specific minimum return and typically utilizes synthetic guaranteed investment certificates ("GICs") to finance that specific

-12-

1   guaranteed rate of return.

2       49.    The Plan offered a stable value fund, the Merrill Lynch Retirement Preservation

3   Fund, until approximately 2010, when Merrill Lynch ("Merrill") exited the stable value business.

4   It appears that, since Merrill ceased offering a stable value product, this valuable investment tool

5   in retirement plans was simply eliminated as an available investment option within the Plan.

6       50.    The Plan does not offer any stable value option at this time, even though

7   Vanguard and other providers offer well-diversified stable value funds which return almost two

8   (2) percent annually -- which is well above money market fund yields at all pertinent times.

9       51.    Instead, as discussed above, the Plan offers a BlackRock Money Market Fund that

10  provides minuscule returns.  The failure to offer participants a stable value fund investment

11  option or the means to access stable value options through a self-directed brokerage window (or

12  some other means) was an abject breach of fiduciary duty since participants are, instead, left with

13  a money market investment option that provides virtually no return on investment as the only

14  "stable value" option.  The inclusion of a money market fund without a stable value option is

15  especially inappropriate since participants generally should only use a money market in a

16  retirement plan for short periods of time, since, although money markets are generally viewed as

17  secure investments (even though they are uninsured and can lose value), stable value funds offer

18  guaranteed returns with security and insurance associated with the underlying investments.

19      **3.    Prior Class Action Settlement**

20      52.    In 2011, Walmart and Merrill agreed to pay a combined $13.5 million to settle a

21  class-action lawsuit over excessive investment fees related to retail mutual funds (as opposed to

22  institutional class funds) and other violations of ERISA.  The settlement provided that the

23  Retirement Plans Committee would be required, for a period of two years, to: (a) retain an

24  independent fiduciary to provide advice and recommendations on selecting and monitoring Plan

25  investment options; (b) review the consultant or independent adviser for conflicts of interest on

26  an annual basis; (c) continue to make available to participants web-based investment education

27

28                                      -13-

resources, including a retirement planning calculator; (d) remove and preclude the addition of fund investment options that are retail mutual funds, funds that pay Rule 12b-1 fees, funds that provide revenue sharing, per-position or per-participant subtransfer agent fees, or other fees, to any party-in-interest as defined in Section 3(14) of ERISA, including the plan's trustee or recordkeeper; and (e) consider adding additional low-cost index funds as plan options.

53.     The Plan does not currently utilize the services of an independent fiduciary or an independent consultant/adviser and, by essentially creating customized and opaque collective trusts that invest in a basket of mutual funds and securities, the Plan is essentially pursuing the same flawed investment approach that resulted in the 2011 settlement.  In sum, it appears that if WalMart ever met the settlement terms listed above for even two years, the Committee has abandoned these prudent requirements at this time and has reverted to certain practices which proved highly problematic in the past.  The Plan remains subject to fiduciary concerns, many of which could have been easily avoided by adhering to the dictates of the settlement beyond the two-year period, such as including additional index funds (including in the Target Date funds); replacing, rather than eliminating, the Stable Value option; hiring a truly independent consultant; and actually eliminating revenue sharing and sub-transfer fees, which exist within the multi-layered collective trusts that comprise most of the Plan's investment options.

**4.     Excessive Fees Paid to Northern Trust and Bank of America**

54.     The Form 5500 indicates that Northern Trust, as Trustee for the Plan, receives $97,380 in direct compensation and no indirect compensation.  The Plan's contract with Northern Trust, however, states that there are three components to its custody fee structure: account-based fees, asset-based fees and transaction-based fees.  Asset-based fees are disclosed as .02 bps per annum on U.S. denominated assets, or approximately $40,000 on $20 billion in assets. For separately managed accounts that hold non-USD assets, there are additional asset-based fees and transaction fees.  For annual fixed daily review service/daily valuation service, the stated fee is $543,000.  There is a 10 bps fee for use of a short-term investment fund, as well as

other fees and expenses, including brokerage commissions, securities lending and foreign exchange charges. Attachment C to the Form 5500 indicates that, at the direction of the Committee, certain fees may be accrued from and reflected in the net asset value of the Trust Fund and daily valued funds. It appears that the $543,000 daily review fee is indirectly deducted from the Net Asset Value of the Plan's assets and thereby constitutes a charge to participants. Again, no indirect fees to Northern are disclosed on the Form 5500 and the disclosed compensation is only $97,380 in direct compensation. As a result, the overwhelming majority of Northern Trust's compensation is not disclosed on the Form 5500 and such compensation is excessive in nature. That is because paying over $625,000 for custodial services in light of the Plan's size and marketing power is grossly excessive. A reasonable fee for such services would be less than $100,000, based upon industry averages.

55. According to the Plan's financial statements, Northern Trust appointed Bank of America as the custodian of the Plan for the limited purpose of making payouts from the Plan in accordance with the Plan document. This limited purpose custodial arrangement is unusual and provides fees and benefits to Bank of America ("BOA" or "Merrill") (the successor to Merrill Lynch) that are unnecessary and result in the Plan paying excessive fees. This arrangement also permits BOA to receive compensation from asset managers related to investments, transfers and withdrawals (as explained below), which fees are not fully disclosed.

56. The Plan's Form 5500 does not indicate that BOA is a limited purpose custodian, but only indicates that Merrill is the recordkeeper. However, it also is disclosed that Merrill earns "float," which compensation generally is earned by a custodian bank.

57. The contract between the Plan and Northern Trust does not specifically state that Northern Trust has appointed Merrill/BOA as the custodian of the Plan for the limited purpose of making payouts from the Plan (as indicated in the Plan financial statements). It does, however, state that the Committee may direct in writing that the custody of assets be maintained by a custodial agent and that, in such event, the Committee will direct the Trustee to enter into a

custody agreement with a custodial agent, who may be an SEC registered broker-dealer.  This language apparently refers to Merrill.  The agreement also states that the Trustee's duties shall be limited to those expressly set forth in the Service Description attached as Attachment "A," but that attachment simply states as follows: "The parties agree to complete the schedule as soon as feasible after the effective date, but in no event later than December 31, 2014."  As a result, the duties of Northern Trust and Merrill in their dual custodial capacities are not clearly delineated and it remains unclear whether Merrill continues to collect undisclosed fees, as it was accused of having done in connection with the prior settlement.

### 5.   Russell's Role As An Investment Adviser And Consultant

58.    The previous settlement required WalMart to retain an independent fiduciary consultant to provide advice and recommendations on selecting and monitoring plan investment options and to review the consultant or independent adviser for conflicts of interest on an annual basis.

59.    According to the Plan's Form 5500, Russell is the Plan "consultant" and it appears that Russell also serves as the Plan's fiduciary investment adviser and is being paid $180,000 per year to advise the Retirement Committee regarding investments.  Russell lacks independence since, as it discloses, Russell may have past, current or future commercial relationships with investment management firms that it researches and evaluates and, as a result, Russell may have conflicts of interest that affect its objectivity.  For example, these investment managers may use Russell's analytical products and may manage monies held in Russell's funds or participate in commission recapture, transition management or other services offered by a Russell broker-dealer.  Since Russell has substantial asset management and brokerage operations, it could not be characterized as an independent fiduciary consultant.  Russell also is a major investor in WalMart itself, having purchased over 3 million shares of WalMart common stock in 2017, thereby further impairing its independence.

60.    Defendants' decision to utilize the services of Russell as a consultant speaks

volumes about the seriousness with which Defendants have taken their fiduciary duties to the Plan.

**6.    HelloWallet "Educational" Services and Excessive Fees**

61.    The previous settlement provided that Wal-Mart would continue to make available to participants web-based investment education resources, including a retirement planning calculator. The settlement did not stipulate whether Walmart or the participants would pay for such educational resources.

62.    According to the Plan's Form 5500, "HelloWallet" receives $1 million in direct payment from the Plan.  Morningstar acquired HelloWallet Holdings ("HelloWallet") for $52 million in 2014. The two companies co-market their financial advisory services to employers and 401k providers. On HelloWallet's website, the following statement appears: "Free to You, As a Walmart Associate. As part of a commitment to improving associate lives, Walmart has paid for 100% of your HelloWallet membership (a $100 value)."  The Form 5500, however, indicates that the Plan (and not WalMart) pays this cost.  The payment of $1 million in direct fees to HelloWallet per annum is grossly excessive in light of the limited services offered by HelloWallet and the availability of less expensive and more robust competitive products in the marketplace.

**7.    Merrill's Recordkeeping Services and Excessive Fees**

63.    As disclosed in the Form 5500, Merrill is paid $23 million in direct compensation, as well as an undisclosed amount of indirect compensation.  According to the service code information provided in the Form 5500, Merrill receives the following elements of compensation: recordkeeping, indirect investment management, sub-transfer agent fees, float, securities brokerage commissions and fees, and other investment fees and expenses.  In the prior settlement, it was agreed that the Plan would not offer funds that provide revenue sharing, per-position or per-participant subtransfer agent fees, or other fees, to any party-in-interest, including Merrill.  The fact that Merrill is now receiving indirect and undisclosed compensation

in its capacity as a service provider is a shocking breach of fiduciary duty on the part of Defendants because those indirect fees apparently are not being used to reduce direct fees in any meaningful fashion.

64.   Defendants also have never engaged in any effort to rebalance revenue sharing payments to engage in fee equalization for participants and, as a result, participants in expensive investments that pay more in terms of revenue sharing payments indirectly subsidize those participants who choose less expensive investment options that pay little or no revenue sharing payments.  None of the Defendants ever disclosed or recommended disclosure of this important and material information regarding the manner in which the Plan effectively discriminates against one class of participants in favor of another class of participants, and should result in participants choosing investments in lower cost index funds if those facts are made available to them.

**8.    WalMart Company Stock**

65.   The Plan offers WalMart company stock as an investment option only with respect to its Employee Stock Ownership Plan, but 401k contributions invested in Company stock as of June 15, 2007 may remain invested until otherwise directed by a participant.

66.   In 2015, $3.9 billion in Plan assets was invested in 46.1 million shares of WalMart stock, which plummeted 26.5 percent in 2015 and over the past 5 and 10 year periods has substantially underperformed its benchmark.  Although WalMart's fee disclosure claims that there is no gross or net expense ratio related to this investment option, at a minimum, it appears that participants are charged the 2 basis point fee assessed by Northern Trust for custodial services.

67.   According to a footnote in the Exhibits to the IPS, "[t]he Committee will review Company Stock performance on an annual basis and will compare it against the return of the Dow Jones Global - U.S. Retail Index and the S&P 500 index."  Despite the consistently dismal performance of WalMart's common stock over the past ten years, Defendants have engaged in no

action to protect the interests of participants by divesting the Plan of its significant holdings of WalMart stock.

### 9. Executive Committee Responsibilities

68.     At all pertinent times, the Executive Committee was legally responsible for monitoring the activities of the Retirement Committee, Russell and WalMart with respect to the management and administration of the Plan.  In light of the apparent breaches of fiduciary duty with respect to the Plan in terms of both poor investment options, inadequate disclosures and blatantly excessive fees, it is apparent that the Executive Committee Defendants breached their fiduciary duties with respect to monitoring the investment alternatives offered in the Plan, the disclosures made by the Plan, the fees paid by the Plan and the acts and omissions of the other Defendants.

### 10. The Absence of Available Passive Investment Options

69.     Throughout the pertinent period, Defendants did not offer Plan participants an appropriate complement of passively managed mutual funds to render the investment options sufficiently diverse or reasonable.  Instead, Defendants consistently offered Plan participants a number of actively managed mutual funds or their equivalents in the form of Collective Trusts, which attempt to beat the market by requiring investors to pay fees to have an expert manage their investment funds (and for which higher fees are almost always charged), with few available passively managed investment or mutual funds.  However, research has consistently found that active funds rarely ever do better than their alternative, passively managed counterparts ("passive funds" or "index funds").  Passive funds attempt to imitate the performance of a market index, such as the S&P 500, by buying all the securities that make up the index. Therefore, passive funds should provide gross investment returns that are very close to those of the market segment tracked by the index with relatively low costs to a plan's participants.  Most existing literature comparing active funds to passive funds has found that active funds fail to achieve what they set out to do. According to certain studies, fund managers for active funds generally make

1  inadequate selections of stocks and their market timing skills are not efficient enough to

2  outperform the market return. In fact, studies consistently show that the raw return of active

3  funds is lower than that of passive funds. *See also* http://www.nytimes.com/2014/07/20/your-

4  money/who-routinely-trounces -the-stock-market-try-2-out-of-2862-funds.html?

5      70.    The excessively priced and poorly performing investment options, which were

6  exceptionally limited in number and lacking in the necessary complement of passively managed

7  mutual funds or other investments to make the Plan's investment portfolio appropriately

8  diversified based upon any reasoned fiduciary review, remained largely unchanged throughout

9  the pertinent period.  Although the previous 2011 settlement certainly created awareness on the

10  part of Defendants of the critical need to examine fees in the marketplace, the minimal nature of

11  the changes also reflects that virtually no due diligence could have been performed regarding

12  available investment options and the fees that should be charged to retirement plans with the

13  assets and purchasing power of the Plan.

14      71.    Defendants' act in offering opaque investment options and the Plan's

15  concentration of investments in such options did not alone amount to any breach of fiduciary

16  duty.  Rather, Defendants' decisions to offer these opaque investment options, coupled with the

17  fact that they were expensive when compared to their mutual fund counterparts (when they are

18  supposed to be designed to be exactly the opposite) and poor performing when compared to their

19  benchmarks and other available investments, along with the fact that they failed to offer any

20  meaningful manner for a participant to diversify his or her investments and avoid the dubious

21  approach of investing in actively managed mutual funds that attempt (but regularly fail) to beat

22  the market and were not accompanied by fulsome disclosures regarding their investment

23  objectives and other risk factors (discussed below), all coupled together resulted in the breaches

24  of fiduciary duty associated with these investment options.

25      72.    Prudent principles of investment philosophy and diversification teach that the Plan

26  should have offered at least a traditional three tiered structure of a well-diversified defined

27

28                                    -20-

contribution plan with the following investment alternatives: (a) a qualified default investment alternative typically in the form of a target date fund for participants with a lack of interest, knowledge or time to create their own diversified portfolio; (b) passive funds in the form of a low cost tier of index funds for participants who wish to construct their own asset allocation without the added cost and risk of active management; and (c) actively managed funds for participants who are comfortable making their own asset allocation decisions and wish to employ an active management strategy.  Of course, in order to achieve such a structure, Plan participants must be offered a full complement of index funds from which to choose in making their investments.  As detailed above, there were limited passive fund investments made available to the Plan and its participants throughout the pertinent period.  *See also* Jeff Brown, *Do Actively Managed Funds Really Pay Off For Investors?* (April 14, 2016) (U.S. News & World Report), http://money.usnews.com/investing/articles/2016-04-14/do-actively-managed -funds-really-pay-off-for-investors ("A year-end study by S&P Dow Jones Indices found that 'over the 10-year investment horizon, 82.14 percent of large-cap managers, 87.61 percent of mid-cap managers, and 88.42 percent of small-cap managers failed to outperform (their index benchmarks) on a relative basis.'  Appeal for the human touch.  But most investment dollars remain in managed funds, so what is their appeal?  Many observers say managed funds survive through salesmanship. Because their higher fees produce bigger profits for fund companies, the firms keep pitching them, these critics say"); Kwak, *Improving Retirement Savings Options For Employees*, 15:2 U. Pa. J. Bus. Law. 483, 512-529 (2013)(explaining why the law of trust and ERISA favors, at a minimum, a presumption in favor of offering index funds, as opposed to actively managed funds).

73.     Defendants' failure and refusal to even consider providing participants with the opportunity to invest their retirement savings in passively managed funds was a breach of fiduciary duty.

**B.**     **Defendants' Breaches Of Fiduciary Duty**

74.     Defendants have severely mismanaged the Plan in a myriad of ways, as detailed above.  Defendants' failure to monitor the investments in the Plan to ensure that they provided adequate available returns and were not excessively priced, as were the vast majority of the investments in the Plan, constitutes breaches of fiduciary duty.  Indeed, the WalMart Plan is an enormously expensive plan in terms of total plan cost when compared to defined contribution retirement plans of a similar size.  Total plan cost ("TPC") is "the combination of explicit and implicit expenses that employers and employees pay for their defined contribution plan."  *See Doing Your Homework: Understanding 401(k) Fees and Making Every Basis Point Count* (Benefits Quarterly; Fourth Quarter 2010)(Hewitt Associates).  In fact, at all pertinent times, the Plan's TPC has been significantly more expensive than the average TPC for defined contribution plans with assets of more than $20 billion.  Defendants knew, or should have known, through the exercise of any modicum of reasonable diligence, that the Plan was paying grossly excessive fees.  Based upon the Plan's design, participants in the Plan pay virtually all of these excessive fees and, as a result, achieve significantly lower retirement savings, since these excessive fees, especially when compounded, have a devastating impact upon the participants' retirement savings.

75.     At all pertinent times, WalMart, the Retirement Plans Committee and Russell were responsible for selecting and monitoring the investments.  Defendants breached their fiduciary duties by imprudently failing to monitor the fees charged directly and indirectly to the Plan and its participants, and by failing to ensure that such fees were fair and reasonable under all of the circumstances.

76.     At all pertinent times, the Retirement Plans Committee, Russell and WalMart were responsible for offering prudent and sound advice with respect to the investments offered to participants of the Plan in the sole interest of the Plan participants, disclose necessary information such that the Plan participants could make informed decisions, and to ensure that the

fees and expenses charged with respect to these investments were fair and reasonable. Defendants breached those fiduciary duties.

77.     At all pertinent times, Defendants were legally responsible for monitoring the advice and services provided by the Plan's service providers.  In light of the apparent breaches of fiduciary duty in terms of both poor investment options, blatantly excessive fees, and undisclosed conflicts and fees, it is apparent that all Defendants breached those fiduciary duties.

78.     As a participant in the Plan, Plaintiff directed that his contributions to the Plan be allocated to certain investment options made available to him by Defendants, including the target date funds identified above.  Plaintiff did not have knowledge of the costs and performance of the Plan's investments, as compared to other available alternatives for similarly-sized defined contribution plans, or information regarding other available share classes for the Plan's mutual funds or other investments (including information about which share classes charged lower expense ratios), information regarding the Collective Trusts (including whether these instruments had layered fees that rendered their expense ratios illusory and/or understated), or information regarding the actual/effective fees charged to participants in the Plan until shortly before this lawsuit was filed.  Moreover, given the undisclosed nature of certain of the fees at issue, Plaintiff remains unaware of the full scope of all fees paid by the Plan to this very day.

79.     Throughout the pertinent period, Defendants were aware of the potential benefits of passive management, as opposed to active management, but engaged in no serious deliberations about the wisdom of doing so and literally did very little to provide Plan participants with an opportunity to avoid actively managed funds and the expenses and risks associated with them.

80.     None of the Defendants provided Plan participants with information regarding the performance of actively versus passively managed investments and thereby supported the active management investment strategy explicitly and implicitly endorsed by the Retirement Committee, Russell, WalMart and the Executive Committee through the investment choices

offered, while effectively masking the truth about the long-term underperformance of virtually all actively managed investments, when compared to passively managed investments, which is entirely consistent with "efficient fund hypothesis" and to be expected based upon "efficient market hypothesis." www.forbes.com/sites/rickferri/2012/04/10/the-efficient-fund -hypothesis/#294e4e867ba1.  Any responsible and prudent investment adviser or fiduciary should have been familiar and conversant with these principles and, at a minimum, should have considered their impact in determining a complement of diversified investment options to be offered to participants.  Of course, since the Plan is a retirement savings vehicle, long-term performance of available investments is one of the most important factors to be considered by Defendants on behalf of the Plan.  Thus, through their incomplete and misleading reporting, Defendants encouraged an investment strategy that failed to consider or offer an opportunity to participants to pursue a passive management investments strategy through an appropriately diverse menu of investment options if a participant chose to pursue such an investment strategy.

81.     Defendants also engaged in virtually no significant consideration, examination or bench-marking of the costs associated with the Plan, including any evaluation of TPC, which is discussed more fully below, and did not engage in any detailed examination of whether there were better and/or less costly investment options available to the Plan and its participants or if the Plan should offer a greater complement of passively managed investments or a sufficient number of passively managed investments to permit a participant to meaningfully pursue a passive management investment strategy, as opposed to an active management investment strategy.  Indeed, Defendants only considered a handful of potential changes in the investment options offered to the Plan's participants during the pertinent period, and consistently chose not to replace poor performing and/or unnecessarily expensive investment options with more prudent alternatives despite possessing specific evidence and information that would have resulted in a prudent fiduciary replacing investment options or, at a minimum, improving and expanding the scope of investment options available to Plan participants.

-24-

82.     The skewed investment options selection offered by Defendants throughout the pertinent period translated into the Trust Fund's allocation of Plan assets as well.  For example, because the opaque target date funds are treated as the default investment option, over one-third of the Plan's assets were placed in these opaque Collective Trusts.

83.     The Plan's predisposition for unregistered and opaque investment options matches the lack of disclosures of information material to Plan participants, which is indicative of Defendants' approach to their fiduciary duties.  This lack of clarity renders a determination of the true and full nature of the expenses or fees being charged and incurred nearly impossible, and precludes participants from making informed decisions regarding their investments.  In their "fee" disclosures to participants, all that Defendants disclosed to participants was the gross expense ratio of any given investment option without detailing the layered fees that existed within these largely unregistered products, the amount of revenue sharing[1] being paid to the Plan's service provider (*i.e.*, Merrill), the purpose of such revenue sharing payments and whether the amount related in any manner to the services being rendered to the Plan and/or the actual entities receiving the revenue sharing payments.  In sum, the revenue sharing disclosures provided by Defendants to Plan participants were, at best, meaningless and, at times, entirely misleading in nature.

84.     Notwithstanding the lack of transparency of the selection of investment options and general lack of disclosures, which makes scrutiny of the true and full nature of fees and expenses, as well as investment options, virtually impossible, the information that is available indicates that the Plan and its participants were required to pay excessive fees for the mutual funds and other investment options during the pertinent period.  These fees are, on their face,

---

[1] *See* Reich *Revenue Sharing: What Is It?* (Plan Sponsor Magazine)(October 2008) http://www.plansponsor.com/MagazineArticle.aspx?Id=4294990365 ("The 401(k) industry calls it revenue sharing. The mutual fund industry calls it 12b-1 fees, subtransfer agency fees, shareholder servicing fees, and profit-sharing payments. The Department of Labor (DoL) calls it indirect payments.  Plaintiffs' attorneys call it 'hidden and excessive' fees.... [A]lmost all plan providers and many advisers receive indirect payments from the investments in 401(k) plans").

unreasonable in many instances and often are multiples higher than the amounts they should be (when compared to the expense ratios that would be associated with typical mutual fund share classes held in retirement plans assets of the same or similar size of the WalMart Plan), based upon the market and negotiating power of the Plan at the time that these investment options were offered.

## V.   ERISA'S FIDUCIARY STANDARDS

85.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan.  29 U.S.C. §1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> > (ii)    defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

86.     Under 29 U.S.C. 1103(c)(l), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

87.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

88.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

89.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by

another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant

part, as follows:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2)     if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

90.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to

enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.  Section 1109(a)

provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

91.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to

bring an action individually, on behalf of the Plan, to enforce a breaching fiduciary's liability to

the Plan under 29 U.S.C. § 1109(a).

## <u>COUNT I</u>
### (For Breach Of Fiduciary Duty)

92.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

93.     Defendants' conduct, as set forth above, violates their fiduciary duties under

ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A),(B) and (C), in that Defendants failed

and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

94.   As a direct result of Defendants' breaches of duties, Plaintiff and the Plan have suffered losses and damages.

95.   Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (In The Alternative, Liability For Knowing Breach Of Trust)

96.   Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

97.   In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust.

98.   To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in

-28-

breaches of fiduciary duty by permitting the Plan to offer a menu of poorly-performing and expensive investment options that cannot be justified in light of the size of the Plan and the other expenses of the Plan.

WHEREFORE, Plaintiff, on behalf of himself and the Plan, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

1    Dated: May 26, 2017               Respectfully submitted,

2                                   SHEPHERD, FINKELMAN, MILLER
                                    & SHAH, LLP

/s/ Kolin C. Tang
Kolin C. Tang
11755 Wilshire Blvd, 15th Floor
Los Angeles, CA 90025
Telephone: (323) 510-4060
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller
& Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
        lrubinow@sfmslaw.com

Hassan A. Zavareei
Jeffrey D. Kaliel
Anna C. Haac
Tycko & Zavareei LLP
1828 L Street, NW, Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
Email: hzavareei@tzlegal.com
        jkaliel@tzlegal.com
        ahaac@tzlegal.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile: (818) 609-0892
Email: sahagii@aol.com

***Attorneys for Plaintiff
and the Plan***

-30-